ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COLONEL (RET.) CLIFFORD ACREE )
2348 Caddie Court )
Oceanside, CA 92056, )
)
COLONEL MICHAEL CRAIG BERRYMAN )
9294 Lilge Circle )
Navarre, FL 32566, )
)
STAFF SERGEANT (RET.) TROY DUNLAP )
2417 Cosmic Drive )
Joliet, IL 60431, )
)
COLONEL (RET.) DAVID EBERLY )
205 Roger Webster )
Williamsburg, VA 23185, )
)
LIEUTENANT COLONEL (RET.) JEFFREY FOX )
1821 Windmere Way )
Surfside Beach, SC 29575, )
)
CHIEF WARRANT OFFICER (RET.) GUY HUNTER )
125 Rock Creek Drive )
Jacksonville, NC 28540, )
)
SPECIALIST DAVID LOCKETT )
401 Twin Creek Drive )
Apartment 16H )
Killeen, TX 76543, )
)
COLONEL H. MICHAEL ROBERTS )
452 Chandler Drive )
Wright Patterson AFB, OH 45433, )
)
LIEUTENANT COLONEL RUSSELL SANBORN )
3503 Stanford Road )
New Bern, NC 28562, )
)
COMMANDER LAWRENCE SLADE )
1536 Bay Point Drive )
Virginia Beach, VA 23454, )

FILED
NOV 28 2006
U.S. COURT OF FEDERAL CLAIMS

No. 06-798C

MAJOR (RET.) JOSEPH SMALL )
4539 Cloverdale Drive )
Racine, WI 53403, )
)
STAFF SERGEANT DANIEL STAMARIS )
109 West Church Street )
Headland, AL 36345, )
)
CAPTAIN (RET.) R. DALE STORR )
7018 North Elgin )
Spokane, WA 99208, )
)
LIEUTENANT COLONEL ROBERT SWEET )
4723 Misty Valley Circle )
Valdosta, GA 31602, )
)
LIEUTENANT COLONEL (RET.) JEFFREY TICE )
8263 E. Knollwood Terrace )
Tucson, AZ 85750, )
)
LIEUTENANT (RET.) ROBERT WETZEL )
20993 East Crestline Place )
Centennial, CO 80015, )
)
COMMANDER JEFFREY ZAUN )
353 7th Street )
Apartment 2 )
Jersey City, NJ 07032, )
)
MRS. CYNTHIA ACREE )
2348 Caddie Court )
Oceanside, CA 92056, )
)
MRS. LEIGH BERRYMAN )
9294 Lilge Circle )
Navarre, FL 32566, )
)
MRS. GAIL STUBBLEFIELD )
853 Rolling Hills Road )
Karnak, IL 62956, )
)
MR. RONALD DUNLAP )
865 Rolling Hills Road )
Karnak, IL 62956, )

MRS. BARBARA EBERLY )
205 Roger Webster )
Williamsburg, VA 23185, )
)
MR. TIMM EBERLY )
205 Roger Webster )
Williamsburg, VA 23185, )
)
DR. ROBERT FOX )
111 Prosser Trail )
Charleston, RI 02813, )
)
MR. TERRENCE FOX )
3 Wren Way Court )
Stafford, VA 22554, )
)
MRS. PATRICIA BORDEN )
353 Arcade Avenue )
Seekonk, MA 02771, )
)
MRS. NANCY GUNDERSEN )
8952 South Tuscany Lane )
Highlands Ranch, CO 80130, )
)
MR. TIMOTHY FOX )
161 St. Ives Drive )
Savannah, GA 31419, )
)
MRS. MARY HUNTER )
125 Rock Creek Drive )
Jacksonville, NC 28540, )
)
MRS. LAURA REEVES )
1515 Apache Drive, Unit A )
Chula Vista, CA 91910, )
)
MR. WILLIAM (RAY) HUNTER )
USS Rhode Island, Gold Crew )
NAV SUB BASE )
Kings Bay, GA 31547, )
)
MS. MARY ELIZABETH (LILY) HUNTER )
125 Rock Creek Drive )
Jacksonville, NC 28540, )
)

MRS. PATRICIA ROBERTS )
452 Chandler Drive )
Wright Patterson AFB, OH 45433, )
)
MRS. STARR BARTON )
1958 Jamaica Drive )
Navarre, FL 32566, )
)
MRS. ANNA SLADE )
1536 Bay Point Drive )
Virginia Beach, VA 23454, )
)
MRS. LEANNE SMALL )
4539 Cloverdale Drive )
Racine, WI 53403, )
)
MR. DAVID STORR )
13753 Fleet Street )
Woodbridge, VA 22191, )
)
MR. DOUGLAS STORR )
11 Woodstock Lane )
Burlington, NJ 08016, )
)
MS. DIANE STORR )
1201 US Highway 93 )
Apartment 232 )
Poisen, MT 59860, )
)
MR. ARTHUR SWEET )
1 Dogwood Lane )
Washington, WV 26181, )
)
MRS. MARY ANN SWEET )
1 Dogwood Lane )
Washington, WV 26181, )
)
MR. MICHAEL SWEET )
350 March Lane )
Morgantown, WV 26508, )
)
MRS. JACQUELINE WETZEL )
20993 East Crestline Place )
Centennial, CO 80015, )

MR. WILLIAM WETZEL )
3554 Ocean Drive )
Apartment N901 )
Vero Beach, FL 32963, )
)
MR. JAMES WETZEL )
789 Wyeth Street )
West Melbourne, FL 32904, )
)
MR. EDWARD WETZEL )
62 Brunswick Avenue )
Metuchen, NJ 08840, )
)
MS. MARGARET WETZEL )
5665 Live Oak Avenue )
Melbourne Village, FL 32904, )
)
MR. PAUL WETZEL )
9461 South Hibiscus Drive )
Highlands Ranch, CO 80126, )
)
MRS. KATHLEEN FARBER )
4982 Dorsey Hall Drive )
Apartment C4 )
Ellicott City, MD 21042, )
)
MRS. ANNE KOHLBECKER )
73 Parker Avenue )
Little Silver, NJ 07739, )
)
MRS. SALLY DEVIN )
30 Wakefield Court )
Shrewsbury, NJ 07702, )
)
MR. CALVIN ZAUN )
19 Whitman Avenue )
Cherry Hill, NJ 08002, )
)
MRS. MARJORIE ZAUN )
19 Whitman Avenue )
Cherry Hill, NJ 08002, )

| | |
|---|---|
| MS. LINDA ZAUN LESNIAK<br>3005 Chapel Avenue West, #4F<br>Cherry Hill, NJ 08002,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**

Former prisoners of war ("POWs") held and tortured by the Republic of Iraq, the Iraqi Intelligence Service, and Saddam Hussein (the "underlying Iraqi defendants," which are not parties to this action) during the 1991 Gulf War, and their principally-affected family members (collectively "Plaintiffs"), hereby allege that the United States ("United States" or "Defendant") is liable to Plaintiffs for the value of the property it took in connection with a public purpose and without just compensation.

Plaintiffs, as and for their Complaint, allege as follows:

**NATURE OF THE ACTION**

1. The United States has taken Plaintiffs' property in the form of a judgment rendered in their favor and in the form of their judicially-cognizable claims against their captors and torturers in violation of the Just Compensation Clause of the Fifth Amendment of the United States Constitution. The United States' actions taken in furtherance of its avowed purpose of shielding Iraq from liability to aid in the reconstruction of that country directly resulted in the vacatur of Plaintiffs' final civil judgment, and the cancellation of all their judicially cognizable claims against the underlying Iraqi defendants.

2. Plaintiffs' principal objective in bringing their historic claim against the underlying Iraqi defendants – the first on behalf of POWs who withstood state-directed torture at the hands of a terrorist state – has always been to prevent future torture of American service personnel through the deterrent effect of a substantial judgment against their torturers. Accordingly, as reflected in their suit against the underlying Iraqi defendants filed on April 4, 2002, Plaintiffs have sought compensation from their Iraqi torturers, not the United States, as provided for under U.S. law in 28 U.S.C. § 1605(a)(7). Despite the filing of this Complaint, Plaintiffs remain committed to working jointly with the United States to ensure that Iraq is held accountable for their torture as mandated by the United States District Court for the District of Columbia in Civil Action No. 02-632 (RWR). This remains Plaintiffs' objective and preference. Plaintiffs regret the continued hard-line stance of the Administration, which has necessitated the filing of this Complaint, and remain open to a negotiated solution which holds only Iraq accountable for their torture. In this regard, Plaintiffs would welcome the alternative dispute resolution mechanisms provided for in this Court's rules. But, in the absence of a satisfactory negotiated solution holding Iraq accountable, Plaintiffs bring this action for the taking of their final judgment and claims against Iraq, takings which have effectively terminated their judicially-cognizable legal rights.

3. But for the actions of the United States, Plaintiffs would today still hold their substantial judgment against Saddam Hussein, the Iraqi Intelligence Service, and the Republic of Iraq. The purpose of Defendant's action, in seeking to intervene only after Plaintiffs were awarded a final judgment, was to take that judgment. The effect of Defendant's action was to take that judgment as well as the totality of Plaintiffs' judicially-cognizable claims against Iraq.

4. Plaintiffs have given much for their country. While there may be times when private property must be taken for a public use, in those circumstances, the rule of law as set out in the Just Compensation Clause of the Fifth Amendment, requires just compensation so that certain individuals alone will not be required to bear burdens which in all fairness should be borne by the public as a whole.

## JURISDICTION

5. This is an action for money damages to recover just compensation for the taking of certain property rights of Plaintiffs; specifically, and separately, both Plaintiffs' final judgments against Saddam Hussein, the Iraqi Intelligence Service, and the Republic of Iraq, and all of Plaintiffs' related judicially-cognizable claims. This court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) and the Fifth Amendment of the United States Constitution.

## PARTIES

6. Plaintiff Colonel (Ret.) Clifford Acree is a United States citizen and a resident of the State of California.

7. Plaintiff Mrs. Cynthia Acree is a United States citizen and a resident of the State of California.

8. Plaintiff Colonel Michael Craig Berryman is a United States citizen and a resident of the State of Florida.

9. Plaintiff Mrs. Leigh Berryman is a United States citizen and a resident of the State of Florida.

10. Plaintiff Staff Sergeant (Ret.) Troy Dunlap is a United States citizen and a resident of the State of Illinois.

11. Plaintiff Mrs. Gail Stubblefield is a United States citizen and a resident of the State of Illinois.

12. Plaintiff Mr. Ronald Dunlap is a United States citizen and a resident of the State of Illinois.

13. Plaintiff Colonel (Ret.) David Eberly is a United States citizen and a resident of the State of Virginia.

14. Plaintiff Mrs. Barbara Eberly is a United States citizen and a resident of the State of Virginia.

15. Plaintiff Mr. Timm Eberly is a United States citizen and a resident of the State of Virginia.

16. Plaintiff Lieutenant Colonel (Ret.) Jeffrey Fox is a United States citizen and a resident of the State of South Carolina.

17. Plaintiff Dr. Robert Fox is a United States citizen and a resident of the State of Rhode Island.

18. Plaintiff Mr. Terrence Fox is a United States citizen and a resident of the State of Virginia.

19. Plaintiff Mrs. Patricia Borden is a United States citizen and a resident of the State of Massachusetts.

20. Plaintiff Mrs. Nancy Gundersen is a United States citizen and a resident of the State of Colorado.

21. Plaintiff Mr. Tim Fox is a United States citizen and a resident of the State of Georgia.

22. Plaintiff Chief Warrant Officer (Ret.) Guy Hunter is a United States citizen and a resident of the State of North Carolina.

23. Plaintiff Mrs. Mary Hunter is a United States citizen and a resident of the State of North Carolina.

24. Plaintiff Mrs. Laura Reeves is a United States citizen and a resident of the State of California.

25. Plaintiff Mr. William (Ray) Hunter is a United States citizen and a resident of the State of Georgia.

26. Plaintiff Ms. Mary Elizabeth (Lily) Hunter is a United States citizen and a resident of the State of North Carolina.

27. Plaintiff Specialist David Lockett is a United States citizen and a resident of the State of Texas.

28. Plaintiff Colonel H. Michael Roberts is a United States citizen and a resident of the State of Florida.

29. Plaintiff Mrs. Patricia Roberts is a United States citizen and a resident of the State of Ohio.

30. Plaintiff Mrs. Starr Barton is a United States citizen and a resident of the State of Florida.

31. Plaintiff Lt. Col. Russell Sanborn is a United States citizen and a resident of the State of Florida.

32. Plaintiff Commander Lawrence Slade is a United States citizen and a resident of the State of Virginia.

33. Plaintiff Mrs. Anna Slade is a United States citizen and a resident of the State of Virginia.

34. Plaintiff Major (Ret.) Joseph Small is a United States citizen and a resident of the State of Wisconsin.

35. Plaintiff Mrs. Leanne Small is a United States citizen and a resident of the State of Wisconsin.

36. Plaintiff Staff Sergeant (Ret.) Daniel Stamaris is a United States citizen and a resident of the State of Alabama.

37. Plaintiff Captain (Ret.) R. Dale Storr is a United States citizen and a resident of the State of Washington.

38. Plaintiff Mr. David Storr is a United States citizen and a resident of the State of Virginia.

39. Plaintiff Mr. Douglas Storr is a United States citizen and a resident of the State of New Jersey.

40. Plaintiff Ms. Diane Storr is a United States citizen and a resident of the State of Montana.

41. Plaintiff Lt. Col. Robert Sweet is a United States citizen and a resident of the State of West Virginia.

42. Plaintiff Mr. Arthur Sweet is a United States citizen and a resident of the State of West Virginia.

43. Plaintiff Mrs. Mary Ann Sweet is a United States citizen and a resident of the State of West Virginia.

44. Plaintiff Mr. Michael Sweet is a United States citizen and a resident of the State of West Virginia.

45. Plaintiff Lieutenant Colonel (Ret.) Jeffrey Tice is a United States citizen and a resident of the State of Arizona.

46. Plaintiff Lieutenant (Ret.) Robert Wetzel is a United States citizen and a resident of the State of Colorado.

47. Plaintiff Mrs. Jacqueline Wetzel is a United States citizen and a resident of the State of Colorado.

48. Plaintiff Mr. William Wetzel is a United States citizen and a resident of the State of Florida.

49. Plaintiff Mr. James Wetzel is a United States citizen and a resident of the State of Florida.

50. Plaintiff Mr. Edward Wetzel is a United States citizen and a resident of the State of New Jersey.

51. Plaintiff Ms. Margaret Wetzel is a United States citizen and a resident of the State of Florida.

52. Plaintiff Mr. Paul Wetzel is a United States citizen and a resident of the State of Colorado.

53. Plaintiff Mrs. Kathleen Farber is a United States citizen and a resident of the State of Maryland.

54. Plaintiff Mrs. Anne Kohlbecker is a United States citizen and a resident of the State of New Jersey.

55. Plaintiff Mrs. Sally Devin is a United States citizen and a resident of the State of New Jersey.

56. Plaintiff Commander (USNR) Jeffrey Zaun is a United States citizen and a resident of the State of New Jersey.

57. Plaintiff Mr. Calvin Zaun is a United States citizen and a resident of the State of New Jersey.

58. Plaintiff Mrs. Marjorie Zaun is a United States citizen and a resident of the State of New Jersey.

59. Plaintiff Ms. Linda Zaun Lesniak is a United States citizen and a resident of the State of New Jersey.

60. Defendant is the United States.

## FACTUAL HISTORY

61. Iraq invaded Kuwait in August 1990, triggering its classification by the State Department as a state sponsor of terrorism and leading to the freezing of its assets then present in the United States.

62. Following the invasion of Kuwait, the United States interceded, invading in January 1991. Twenty-one American servicemen and women were captured as POWs and tortured. The tortuous treatment included among other despicable actions beatings, starvation, electric shock, whipping, mock executions, drug injection, threatened castration and dismemberments, horrifying genital inspections, broken bones and eardrums, deprivation of medical care, and confinement in vile, disease-ridden filth. These actions were condemned in 1991 by Congress in three separate resolutions.

63. Treatment while in the hands of Iraqi intelligence personnel was barbarous. The torture varied for each POW Plaintiff but the overall torture of the American POWs by Iraqi officials included severe beatings with pistols and rifles, weighted rubber hoses, truncheons, blackjacks, fists, belts, metal pipes, batons, and sticks, including an axe handle. It further included mock executions; threatened castration; threatened amputation of fingers and dismemberment; threatened death; threats to send their body parts to their families in the United States; systematic starvation; systematic exposure to freezing cold; intentional deprivation of medical care; purposeful aggravation of existing injuries; electrical shock with a device wrapped around a POWs head; injection of a mind altering substance; kicking, including with steel-toed boots; cupped hand blows to the ears; beating with a mallet on the knees; handcuffs and restraints so tight as to cut off circulation, damage nerves, and cause the hands to swell and turn purple; use of cattle prods and stun guns; being knocked unconscious, sometimes repeatedly; blows to the legs and neck with a heavy pendulum-like object; whipping with a cat-o'-nine-tails; confinement in darkness; confinement in filth exposing them to contagion and infection; burning with cigarettes and heated spoons; being led blindfolded into walls and stairwells; being urinated and spat upon; mental suffering about the agony that their families must be enduring when the POWs were not permitted by the Iraqi authorities to inform their families that they were alive; living in constant fear of death and further torture, a climate intended to create humiliation and degradation; and other atrocities causing great suffering and serious injury.

64. The POWs suffered not only unspeakable and prolonged physical pain but also intense and prolonged mental anguish and harm, both during the actual infliction of torture and throughout their captivity. They lived constantly in terror of further torture of the type their captors had already inflicted upon them, new and unknown tortures, and the fear of death and

dismemberment repeatedly threatened by their captors. They heard fellow prisoners' anguished cries during torture, sometimes even recognizing the victims' voices. Hearing the terrorizing torture of other POWs gave the POWs a vivid preview of what they could expect, greatly contributing to their anguish.

65. The POWs' family members also suffered prolonged mental anguish and harm as a result of Iraq's brutal torture of their loved ones.

66. On April 4, 2002, seventeen of the Gulf War POWs and thirty-seven of their close family members sued the underlying Iraqi defendants under the 1996 amendment to the Foreign Sovereign Immunities Act ("FSIA"). Congress in the 1996 amendment made a clear pronouncement that American citizens tortured by government officials of a terrorist state should be able to hold that state accountable and satisfy any judgment from the blocked assets of that country in order to send the message that these actions will not be tolerated.

67. On September 25, 2002, after the underlying Iraqi defendants failed to respond to an offer of arbitration and service of process through the State Department, an entry of default was entered against them.

68. On November 26, 2002, President Bush signed the Terrorism Risk Insurance Act ("TRIA"), including a provision specifically designed to ensure that Americans can collect court-ordered compensatory damages from frozen assets of terrorist states in cases of terrorist acts, including cases of torture under § 1605(a)(7) of the FSIA.

69. Thereafter commenced the United States' overt and coordinated efforts to take the POWs' claims in furtherance of its stated public policy of assisting Iraq, a public purpose within the meaning of the Fifth Amendment of the United States Constitution.

70. On March 14, 2003, twenty of the most highly-regarded former U.S. officials from the national security and defense arenas, including a Chairman of the Joint Chiefs of Staff, urged the President that it was in the United States' national security interest to help put an end to the torture of American POWs. They further urged the President to set aside an escrow to allow for the payment, from the Iraqi frozen funds, of an anticipated judgment in favor of the POWs.

71. On March 20, 2003, President Bush confiscated and vested the $1.7 billion in frozen Iraqi assets held in private banks in the United States. The President's Order set aside $306 million in frozen assets to pay two judgments against Iraq, including that of "human shield" hostages held by threat in Kuwait in 1990. No provision was made for the POWs. The remainder of the assets were placed in an account at the Federal Reserve Bank of New York.

72. On April 16, 2003, Congress passed a provision in an emergency wartime appropriations, § 1503 of the Emergency Wartime Supplemental ("EWSAA") (Pub. L. No 108-11), which gave the President only the authority to remove bars to spending and conducting commercial business in Iraq.

73. On May 2, 2003, the President sent a letter to Congress stating his intent to invoke § 1503. He did the same in a May 7, 2003 Determination. In neither case was any mention made of the FSIA or TRIA. Moreover, § 1503, on its face, was not meant to include the FSIA or TRIA as it was limited to removing past sanctions-related bars to spending in Iraq by U.S. entities so that reconstruction could get started.

74. It was not until May 22, 2003, that the President sent a "Message" to Congress purporting to make "inapplicable" the FSIA and TRIA to – only – Iraq. This Presidential "Message," purportedly extending the May 7, 2003 Presidential Determination to the FSIA, was

the first time the Executive asserted in any way that § 1503 of the EWSAA, or the President's Determination of May 7, 2003, would extend to the FSIA. This new general rule or interpretation was not published in the Federal Register as required.

75. That same day the President issued Executive Order 13303, invoking the International Emergency Economic Powers Act ("IEEPA"). That Order prohibited and nullified "any attachment, judgment, decree, lien, execution, garnishment, or other judicial process" against the Development Fund for Iraq (a fund dedicated to Iraqi reconstruction), against Iraqi petroleum products, and against revenue derived from the sale of those products. 68 Fed. Reg. 31931-32. In E.O. 13303, the President stated that the "threat of attachment or other judicial process" against these Iraqi assets "obstructs the orderly reconstruction of Iraq, the restoration and maintenance of peace and security in the country, and the development of political, administrative, and economic institutions in Iraq." Id. at 31931. The President concluded that "[t]his situation constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States." Id.

76. As the United States later asserted in its December 2003 Brief for the Appellant to the Court of Appeals for the D.C. Circuit, the President in a report to Congress "elaborated that '[a] major national security and foreign policy goal of the United States is to ensure that the newly established Development Fund for Iraq and other Iraqi resources, including petroleum and petroleum products, are dedicated for the well-being of the Iraqi people, for the orderly reconstruction and repair of Iraq's infrastructure, for the continued disarmament of Iraq, for the costs of indigenous civilian administration, and for other purposes benefiting the people of Iraq.' The President also explained that the entry or enforcement of judgments against Iraq would 'jeopardiz[e] the full dedication of such assets to purposes benefiting the people of Iraq,' and

thereby threaten the national security and foreign policy of the United States." Br. for the Appellant 8-9 (Dec. 19, 2003).

77. The United States also stated that "[w]ith the ouster of Saddam Hussein and his regime from power, our national security and foreign policy interests towards Iraq have changed fundamentally. Now, rather than seeking to impose sanctions on Iraq, Congress and the President have sought to provide assistance to facilitate the prompt and orderly reconstruction of Iraq, and thereby to promote the emergence of a stable, peaceful, and democratic new Iraqi government." Id. at 23.

78. Further, the United States made clear a point that is pivotal to the present action: "[W]hile Saddam's regime was being driven from power, Congress and the President acted repeatedly to facilitate the prompt and orderly reconstruction of Iraq. They recognized (including in EWSAA itself) that Iraq urgently needed substantial funding for reconstruction. They recognized the threat posed by existing litigation to ongoing reconstruction efforts, and the President (with express authorization from Congress) therefore undertook not only to prohibit the entry of future judgments against certain particularly important Iraqi assets, but also to nullify existing judgments against such assets." Id. at 30-31 (emphasis in original) (internal citation omitted).

79. On July 7, 2003, Judge Roberts of the United States District Court for the District of Columbia ruled in Acree v. Republic of Iraq that the underlying Iraqi defendants were liable for the injuries caused to Plaintiffs, and entered judgment for $653 million in compensatory damages and $306 million in punitive damages. The court found that: "No one would subject himself for any price to the terror, torment, and pain experienced by these American POWs," and

that "there must be a premium on protecting POWs [because] POWs are uniquely disadvantaged and deterring torture of POWs should be of the highest priority."

80. Thereafter, Plaintiffs sought a temporary restraining order against the Secretary of the Treasury, John W. Snow, against the depletion of the Iraqi assets in the United States. On July 18, 2003, the court granted the POWs' motion in Acree v. Snow temporarily to restrain the remainder of the Iraqi frozen assets that the U.S. had not already used for rebuilding until the issue of satisfying the judgment could be resolved.

81. On July 21, 2003, the United States moved the District Court in Acree v. Republic of Iraq both to intervene and to vacate the judgment under Fed. R. Civ. P. 59(e). The United States made absolutely, unequivocally clear that it was: (1) seeking to take Plaintiffs' judgment and negate their claims, and (2) doing so in support of its public purpose of aiding Iraq. These purposes were forcefully asserted and effectuated by the actions of the government, as illustrated below.

82. In its July 21, 2003, Memorandum of Points and Authorities In Support of the United States' Motion Under FRCP 59(e) to Vacate Judgment, the United States stated: "The United States has moved to intervene in this case and respectfully moves the Court, under Federal Rule of Civil Procedure 59(e), to vacate the default judgment entered here because, as of May 7, 2003, this Court lacked jurisdiction to enter that judgment against the Government of Iraq. As we explain below, in May 2003, Congress and the President took certain steps to accomplish the critical policy goals of stabilizing Iraq as quickly as possible and reconstructing that country. Following the overthrow of Saddam Hussein, Congress granted the President statutory power to render inapplicable federal laws that otherwise applied to Iraq by virtue of its terrorist activity, and the President promptly exercised this authority." Id. at 1. Further, "The

United States Government fully recognizes the brutal actions to which the plaintiffs here were subjected as they heroically served their country and made sacrifices during the Gulf War in 1991. Plaintiffs' suffering at the hands of the former Iraqi government officials cannot be excused or forgotten. Nevertheless, the political branches of our Government have decided that, now the [sic] oppressive regime of Saddam Hussein has been removed from power, U.S. sanctions against Iraq based on its support for terrorism must be removed. Among the sanctions that were removed by the President on national security grounds is the provision that lifted Iraq's immunity from suit in U.S. courts for certain tort claims, thereby restoring to a liberated Iraq a sovereign immunity afforded by United States law to virtually ever other foreign country." Id. at 2.

83. The United States continued on to explain why it had made the determination that Plaintiffs' claims had to be sacrificed for the good of policy: "As the Supreme Court has recognized, 'outstanding claims by nationals of one country against the government of another country are 'sources of friction' between the two sovereigns. For that reason, the political branches have frequently suspended, compromised, or even extinguished such claims against foreign states. . . . When the Saddam Hussein regime was in power, the United States had a foreign policy interest in allowing victims of certain Iraqi abuses to sue Iraq in U.S. courts. When that regime was removed from power, our foreign policy interests toward Iraq changed fundamentally. Congress recognized that, in order to promote the reconstruction of Iraq and to put the country on the path toward a more stable and prosperous future, it would be important for the Executive Branch to have the flexibility to render inapplicable provisions of U.S. law that had penalized the former Iraqi regime." Id. at 10-11 (internal citations omitted).

84. In its July 21, 2003 Motion to Intervene and Memorandum of Points and Authorities in Support of Motion to Intervene, the United States asserted: "The United States hereby moves to intervene in this action pursuant to Federal Rule of Civil Procedure 24 in order to protect its substantial foreign policy interests in ensuring the successful and peaceful establishment of a democratic government in Iraq and protecting the safety of American troops and innocent Iraqi civilians. In so moving, the United States is not acting on behalf of Iraq, or condoning the acts that brought about this lawsuit. The United States fully recognizes and condemns the brutal actions to which the plaintiffs here were subjected by former Iraqi government officials, and those actions cannot be excused or forgotten. Nevertheless, the United States has weighty foreign policy interests at stake. Specifically, the President and Congress together have taken actions that have divested this Court of jurisdiction over suits against Iraq for terrorist acts. Those actions were taken to promote the foreign policy interests of the United States in ensuring a safe and successful transition in Iraq." Id. at 1. In addition, Defendant stated: "Thus, when confronted with the difficult public policy choices concerning the best methods to promote a stable Iraq and to ensure the availability of funds to achieve that objective, the two branches of government responsible for conducting foreign affairs took action to restore Iraq's sovereign immunity over claims for terrorist acts brought pursuant to § 1605(a)(7). The United States has a clear and substantial interest in seeing that this foreign policy objective is carried out. Courts have recognized the ability of the United States to intervene in suits brought against foreign countries under similar circumstances in order to protect important foreign policy interests." Id. at 4.

85. Similarly, on July 23, 2003, in support of its Opposition to Plaintiffs' Motion for Preliminary Injunction and In Support of His Motion for Summary Judgment in Acree v. Snow,

the United States asserted: "The proper construction of these statues and presidential determinations related to foreign economic sanctions is critical because such decisions may have a far-reaching impact not only on how sanctions programs are administered but also, more broadly, on the conduct of the foreign relations of the United States and on the power of the President to make foreign policy decisions. See Grossman Decl. ¶ 6. The presidential actions at issue here – each of which is expressly authorized by an Act of Congress – seek to advance important foreign policy goals in Iraq and in the Middle East generally. See Bremmer Decl. ¶¶ 6-8, 18; Grossman Decl. ¶ 2, 4."

86. The United States also stated: "By taking these actions, Congress and the President have made explicit their determinations that whatever interests originally supported TRIA, the current situation involving Iraq, and the critically important foreign policy goals to be accomplished there, warrant a re-thinking of the uses to which assets formerly belonging to Iraq should be put. The arguments for granting a stay here are compelling. It cannot be questioned that this case involves serious legal questions involving the President's foreign policy powers and the fate of the United States' goal of aiding in the reconstruction and democraticization of Iraq. As described in the attached declarations, the harm to foreign policy interests and to the public interest from delaying or restricting the flow of funds to Iraq in pursuit of that goal is substantial; and, if increased hostilities result from a delay, or decrease in the amount, of funds, that harm is irreparable. While the United States has nothing but the greatest sympathy for the plaintiffs herein and regrets the injuries that they suffered at the hands of the former tyrannical regime in Iraq, these plaintiffs' interests in collecting on their private judgment do not outweigh the interests in using these funds to protect the safety and the lives of U.S. personnel in Iraq and Iraqi civilians." Id. at 27-29. The United States could not be clearer that it desired to extinguish

Plaintiffs' judgment and claims, a result which it brought about through its motion to intervene and vacate.

87. The Grossman Declaration cited by the United States in its Opposition to Plaintiffs' Motion for Preliminary Injunction and In Support of His Motion for Summary Judgment in Acree v. Snow stated, among other things: "One additional means chosen by the political branches of our Government to achieve the U.S. goals has been to eliminate the effect of any restrictions that had previously been imposed upon Iraq as a result of its status as a state sponsor of terrorism." Grossman Decl. ¶¶ 5, 6.

88. Paul Bremer, then Administrator of the Coalition Provisional Authority in Iraq, filed a declaration on July 23, 2003, in support of Secretary Snow's Motions in Acree v. Snow, asserting that to pay the POW victims out of the Iraqi funds would hamper the ability to rebuild Iraq. He stated: "The CPA requires large amounts of resources to continue the efforts to restore conditions of security and stability, to meet the humanitarian needs of the Iraqi people, to create conditions in which the Iraqi people can freely determine their own political future, and to assist in the rebuilding of the Iraqi economic infrastructure. My assessment is that the asset availability that is hindered by the relief requested in this lawsuit will materially degrade these vitally important efforts." Id. ¶ 3. In addition, he alleged that "Coalition Forces could very well be subject to increased hostilities if vested funds are not available to be expended for these purposes, as evidenced by violent demonstrations by former Iraqi military members protesting the fact that they were excluded from the initial stage of the payment program. Additionally, such hostilities could significantly undermine the Coalition's ability to engage in reconstruction activities in Iraq. The resulting delays in restoring basic services unquestionably could undermine civil order and security throughout Iraq." Id. ¶ 17.

89. Bremer added: "In summary, the United States has an urgent and critical national security need to make use of vested Iraqi funds as soon as possible for humanitarian assistance and reconstruction efforts in Iraq. Restricting these funds as a result of this litigation would affect adversely the ability of the United States to achieve security and stability in the region, would compromise the safety of U. S. forces and Iraqi civilians, and would be harmful to U.S. national security interests." Id. ¶ 18.

90. On July 25, 2003, the POWs sent a letter to the Justice Department seeking a compromise whereby the U.S. would be free to use the assets because of its statements that they were essential to protecting American troops, provided the government replenish the fund from other Iraqi assets at a later date. The government refused to discuss such a compromise.

91. On July 30, 2003, the District Court ruled in Acree v. Snow, siding with the government and finding that the President had withdrawn TRIA as a means of attaching Iraqi frozen assets. The court wrote: "Plaintiffs immediately offered to compromise their awards in the effort to settle the case amicably with their government which they had served so well and for which they honorably endured severe torture. It was an unrequited gesture. According to the government, the President has the authority to designate a variety of assets seized from Iraq as available for satisfying the compensatory awards to the POW torture victims, but has not chosen to do so. . . . The Secretary's position that the POWs are unable to recover any portion of their judgment as requested, despite their sacrifice to their country, seems extreme." Acree v. Snow, Slip Op. at 3-4, 6 (D.D.C. July 30, 2003).

92. On August 6, 2003, Judge Roberts denied the United States' Motion to Intervene and the Motion to Vacate in Acree v. Republic of Iraq, finding that the government's stated public policy interests in intervening and vacating the judgment because it allegedly hampered

rebuilding were insufficient to warrant a post-judgment intervention. The court stated: "Other interests claimed by the United States [in addition to blocking off the seized Iraqi assets] are interests in promoting a new, democratic Iraqi government and in ensuring that courts act only if there is subject matter jurisdiction. Promoting democratic governance is clearly a worthy goal, but the government does not explain how the existence of an adjudication of liability against Iraq, Saddam Hussein and the Iraqi Intelligence Service for the torture of American POWs can interfere with that interest. There is nothing in the record to indicate that the existence of the judgment in this case may as a practical matter impair or impede the government's current efforts to promote a democratic government in Iraq especially now that Saddam Hussein's regime has ended." Acree v. Republic of Iraq, Slip Op. at 9-10 (D.D.C. Aug. 6, 2003).

93. On August 27, 2003, the Department of Justice sent a letter to Plaintiffs stating that despite their then-pending appeal of the July 30, 2003 decision in Acree v. Snow, the government planned imminently to withdraw and transfer the remainder of the blocked Iraqi assets.

94. On October 7, 2003, following oral argument, the Court of Appeals for the D.C. Circuit ruled that the frozen Iraqi assets could not be used by the POWs to satisfy their judgment because, notwithstanding TRIA's mandate that the frozen assets of the terrorist state are to be the source of compensation for victims of torture such as the POWs, the assets were no longer "assets of the terrorist state" following their confiscation and vesting by the United States.

95. On October 15, 2003, Senator Reid sponsored an amendment to the supplemental appropriations bill, making clear that Congress did not intend to interfere with the POWs' suit and calling upon the Bush Administration to develop a fair and reasonable method of providing compensation to the POWs and their family members.

96. On October 27, 2003, the State Department opposed the Reid amendment in a letter filled with misleading and inaccurate statements, and erroneously equating the case to that of the Iran hostage plaintiffs whose action was barred by the Algiers Accords. The Reid amendment was then taken out of the Iraq supplemental appropriations bill by Rep. Wolf in conference.

97. On November 10, 2003, The New York Times published a story detailing how the Bush Administration was blocking the POWs and was not eager to publicize the fact that Department of Justice lawyers were arguing that the POWs' judgment should be overturned.

98. On November 17, 2003, Senator Reid, along with Senator Graham of Florida, reintroduced the earlier struck amendment. Senator Reid stated: "It is beyond my comprehension why these Federal bureaucrats are now siding with Saddam Hussein and against these former prisoners of war who suffered at his hands. These brave heroes are merely seeking to hold Iraq accountable for its crimes, and deter the torture of any American citizen by a terrorist state in the future. A civilized world cannot let such crimes go unpunished. The perpetrators must be held to account." Senator Graham added: "We are sending money to rebuild Iraq, but we are turning our back on a judicial decision that was achieved under laws this body created. We are turning our backs on the torture inflicted upon these 17 veterans who were taken as prisoners of war while serving our country. Mr. President, the costs of war do not end at the borders of Iraq; veterans will continue to pay them for years to come. I urge my colleagues to join us in this effort to see this injustice is rectified."

99. On November 23, 2003, CBS' 60 Minutes broadcasted a Mike Wallace feature on the case with four of the POWs. The piece closed with a quote from Marine Colonel Cliff Acree: "When it comes to our president and our commander-in-chief, he has our undying

support and loyalty. There's no question, no doubt in my mind. Here's what the lawsuit is about. We want to deter, in any way that we can, or lessen the severity of future American POWs -- and there will be more -- we want to lessen the severity of their captivity in any way that we can. If we don't do that, who will?"

100. On December 29, 2003, the Department of Justice filed its Appellant brief with the D.C. Circuit in its appeal of the district court's August 6, 2003 denial of its motion to intervene. It identified the questions presented as (1) whether section 1503 of the EWSAA and Presidential Determination No. 2003-23 divested the district court of subject matter jurisdiction over this case, and (2) whether the district court erred in denying the United States' motion to intervene for the purpose of contesting subject-matter jurisdiction. Brief for Appellant United States at 2. Further, it stated: "After the United States removed the Hussein regime from power in Iraq, our foreign policy toward that nation changed fundamentally. Now, rather than seeking to impose sanctions on Iraq, Congress and the President have sought to provide assistance to facilitate the prompt and orderly reconstruction of Iraq, and thereby to promote the emergence of a stable, peaceful, and democratic new Iraqi government. This dramatic change in foreign policy is at the heart of this appeal." Id. at 14. In addition, it stated: "Intervention here is essential for the United States to protect its weighty foreign policy interests. The district court erroneously suggested that the United States' interests were adequately protected by its successful defense against the attachment of former Iraqi assets attempted in Acree v. Snow. However, although the United States did have a clear interest in protecting vested assets from attachment, it also has a distinct foreign policy interest in ensuring that our courts give immediate effect to Iraq's restored sovereign immunity. As plaintiffs themselves have argued, '[e]ven if the Executive were to return all of the blocked [now vested] assets to Iraq . . . the judgment would remain an obligation

to be dealt with by any new government of Iraq and a failure to meet that obligation could mean substantial continuing legal difficulties for the new government.' That is precisely why section 1503 and the Presidential Determination made immediately inapplicable to Iraq not only terrorism-based attachment provisions such as section 201 of TRIA, but also terrorism-based abrogations of sovereign immunity such as 28 U.S.C. § 1605(a)(7), and it is precisely why the United States has a substantial foreign policy interest in ensuring that courts adhere to those provisions. Moreover, although the defense of immunity may be Iraq's, the United States nonetheless may intervene to protect this Nation's own foreign policy interests." Id. at 53-54 (internal citations omitted).

101. On February 11, 2004, an amicus brief was filed by the Washington Legal Foundation on behalf of Members of Congress, including Senators Reid, Allen, and Murray, and Reps. Conyers, Meeks, and Berman. The Members of Congress stated that the legislature did not grant the President the authority to make the FSIA and/or TRIA "inapplicable" to Iraq.

102. On February 18, 2004, the United States' filed its Appellant Reply brief, again asserting its policy interests in intervention and vacatur.

103. On February 27, 2004, Senator Collins and Senator Allen wrote to Attorney General Ashcroft asking that he personally review the POWs' situation and that he aid the group in its efforts to engage the Bush Administration in talks. The Senators' request was declined. William Moschella, Assistant Attorney General, wrote to Senator Collins on April 6, 2004, stating: "Having removed Saddam Hussein's regime from power by military force, the United States now has a vital interest in the reconstruction of Iraq into a stable, democratic, and peaceful country. This success of this endeavor is essential not only to our Nation's long-term foreign policy interest, but also to reducing the threat that current service members face daily in Iraq.

Moreover, the President has determined that all available Iraqi assets must be used toward achieving these critical goals. If not vacated, the nearly billion-dollar judgment in this case could pose significant problems to the emerging Iraqi government and its reconstruction efforts." Letter from William M. Moschella to the Honorable Susan Collins at 1 (Apr. 6, 2004).

104. On April 7, 2004, oral argument was heard at the D.C. Circuit on whether the government can intervene and vacate the POWs' judgment.

105. On April 8, 2004, Senator Leahy sent a letter to Attorney General Ashcroft expressing his "surprise that the Department is siding with Iraq in this lawsuit, and against our veterans."

106. On June 4, 2004, the D.C. Circuit vacated the POWs' judgment. The Court of Appeals vacated the judgment after first stressing the foreign policy purpose for Defendant's intervention. The court then decided the case on an issue which was never briefed. Moreover, the court vacated the judgment based on the retroactive application of a decision which it had rendered months after Plaintiffs' final judgment. In addition, the court declined to remand to the District Court so that the numerous causes of action pled by Plaintiffs could be considered, despite remanding in cases for this purpose both before and after its *Acree* decision. The effect was that the POWs' judgment, among all of Iraq's debts worldwide, was singled out for dissolution by the United States, which otherwise was content to negotiate reduced obligations among foreign and domestic creditors to Iraq.

107. The Court of Appeals also ruled that § 1503 of the April 16, 2003 EWSAA passed by Congress gave the President only the authority to remove bars to spending and conducting commercial business in Iraq, and not the authority to make the FSIA and TRIA inapplicable to

Iraq. Thus, the court ruled that the very premise which the United States asserted as its justification for attempting to intervene and vacate proved to be illegitimate.

108. On August 20, 2004, the D.C. Circuit denied Plaintiffs' Motion for Rehearing En Banc.

109. On December 17, 2004, Plaintiffs' filed a Petition for Certiorari with the Supreme Court.

110. On March 21, 2005, the United States filed its Opposition to Plaintiffs' Petition for Certiorari. Three additional briefs were filed at this time on Plaintiffs' behalf. Each urged the Court to hear the case. The Washington Legal Foundation filed a brief on behalf of a bipartisan group of 20 Members of Congress. The Center for Terrorism Law was joined on its brief by the National League of POW/MIA Families, the National Commander & National Adjutant of American Ex-Prisoners of War, and a distinguished group of American national security experts. The Center for Justice & Accountability filed a brief on behalf of 21 International Law scholars, emphasizing the universal condemnation of torture and the availability under U.S. law of a right to bring torture claims against the perpetrators. The United States nonetheless continued to argue the policy reason for its action in taking Plaintiffs' judgment, stating: "The success of Iraq is critical to United States foreign policy. . . . Whereas subjecting Iraq to suit under Section 1605(a)(7) [of the FSIA] served the United States' foreign policy interests by threatening large damage awards for the wrongs of the Hussein regime, in the immediate aftermath of the removal of that regime by military force, such judgments would hinder crucial foreign policy objectives." Brief for the United States in Opposition to Plaintiffs' Petition for Certiorari at 14.

111. Defendant has not only consistently told the courts that its purpose in taking Plaintiffs' judgment was to aid the reconstruction of Iraq, but it has made the same statement in a letters to counsel for Plaintiffs, and in letters to Members of Congress who have written to the Attorney General and others on behalf of the POWs and their family members.

112. In addition, in recent letters to Senators Kennedy and Byrd, the Assistant Attorney General gave as the Executive's reason for taking Plaintiffs' judgment and refusing to negotiate with them for protection of their claims against Iraq that "the United States appeared in the *Acree* litigation to enforce a Presidential act, issued in furtherance of the United States' foreign policy and national security interests in Iraq . . . ." Letter from the Honorable William E. Moschella, Assistant Attorney General, to the Honorable Edward M. Kennedy (June 21, 2006).

113. Defendant has fought to deny Plaintiffs' legal claims in all available forums, including the courts and Congress. Defendant has offered no alternative forum for redress against the underlying Iraqi defendants. Instead, Defendant has simply acted to take the final judgment and legal rights of Plaintiffs to hold Iraq accountable. In short, Defendant seeks by their actions to make American POWs tortured by Iraq pay with their judgment and legal rights for the reconstruction of Iraq.

114. Defendant's actions directly and proximately caused and resulted in the extinguishing of Plaintiffs' property rights in their judgment and in their claims.

115. The United States should not be able to annul Plaintiffs' judgment and claims for the public purpose of protecting Iraq, and then not be made to pay just compensation to Plaintiffs for the taking of their property.

116. While the United States claimed to be sympathetic to the Plaintiffs' suffering, Plaintiffs did truly understand the United States' needs during the initial reconstruction period

and offered in writing to compromise because it meant protecting U.S. troops – which is the very purpose of this litigation. As Plaintiffs stated to the Department of Justice on July 25, 2003: "Plaintiffs have more reason than most to support the democratic reconstruction of Iraq and the protection of American lives there. At the same time, the principle of deterring the recurrent torture of American POWs and accountability for the perpetrators of torture must also be doggedly pursued. It is our belief that these goals need not be inconsistent." Letter from Stewart Baker, counsel to Plaintiffs, to Shannen W. Coffin, Deputy Assistant Attorney General at 1 (July 25, 2003).

## CLAIM FOR RELIEF

### Count One: Unconstitutional Taking

117. Plaintiffs re-allege and incorporate by reference paragraphs 1-116.

118. Plaintiffs seek just compensation from Defendant for the taking of their private property for public use. Defendant's actions perpetrated for the express and direct purpose of vacating Plaintiffs' judgment against the underlying Iraqi defendants, and that judgment having been vacated, in furtherance of the public purpose of aiding in the reconstruction of Iraq, violate the Just Compensation Clause to the Fifth Amendment of the United States Constitution.

119. Defendant's actions perpetrated for the express and direct purpose of extinguishing Plaintiffs' valid and valuable judicially-cognizable claims against the underlying Iraqi defendants, in furtherance of the public purpose of aiding in the reconstruction of Iraq, violate the Just Compensation Clause to the Fifth Amendment of the United States Constitution.

120. Plaintiffs are entitled to just compensation as a result of the taking of their property, including their judgment and their underlying judicially-cognizable claims against the underlying Iraqi defendants.

WHEREFORE, Plaintiffs pray for judgment against Defendant the United States as follows:

A. Recovery in an amount to be determined at trial representing just compensation for the taking of Plaintiffs' judgment, and all judicially-cognizable claims against the underlying Iraqi defendants, together with interest, costs, and attorneys' fees; and,

B. Such further relief as the Court deems just and proper.

C. Plaintiffs recognize that Defendant United States may seek, as it is entitled by law, to recover from Iraq any judgments awarded against Defendant by this Court, and they strongly support such action.

Respectfully submitted,

John Norton Moore
D.C. Bar No. 179697
307 Yoakum Parkway
Suite 3-1618
Alexandria, VA 22304
(703) 751-7798
(434) 977-2749 – fax
jmooreesq@aol.com

Stephen A. Fennell
D.C. Bar No. 290379
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
(202) 429-8082
202) 429-3902 – fax
sfennell@steptoe.com
*Admission pending*

Dated November 28, 2006